1

2

3

4

5

6

7                                  IN THE UNITED STATES DISTRICT COURT

8                               FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10

11

12    JOSEPH J. STAVE,                          Case No. 12-4787 JSC

                      Plaintiff,               ORDER AFFIRMING DENIAL OF SOCIAL
13                                             SECURITY BENEFITS

14            v.

15    CAROLYN W. COLVIN, Commissioner of
      Social Security,
16

17                    Defendant.

18

19           Plaintiff Joseph J. Stave seeks social security disability benefits for a combination of

20    impairments, but, most significantly, the pain and instability associated with a left hip fracture.

21    Pursuant to 42 U.S.C. § 405(g) Plaintiff filed this lawsuit for judicial review of the final decision

22    by the Commissioner of Social Security ("Commissioner") denying his benefits claim.[1]  Now

23    pending before the Court are Plaintiff's and Defendant's Motions for Summary Judgment. (Dkt.

24    Nos. 20, 24.) Because the Court concludes that the Administrative Law Judge ("ALJ") did not

25    commit legal error nor abuse her discretion, Plaintiff's motion for summary judgment is denied

26    and Defendant's cross motion is granted.

27    _____

28    [1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin, the Acting Commissioner
      of Social Security, is substituted for the former Commissioner Michael J. Astrue in this action.

United States District Court
Northern District of California

1

**LEGAL STANDARD**

2   A claimant is entitled to disability insurance benefits if he can demonstrate that he is

3 unable to engage in substantial gainful activity due to a medically determinable physical or

4 mental impairment that can be expected to result in death or last for a continuous period of not

5 less than 12 months. 42 U.S.C. § 423(d)(1). The ALJ conducts a five-step sequential inquiry to

6 determine whether a claimant is entitled to benefits. 20 C.F.R. § 416.920. At the first step, the

7 ALJ considers whether the claimant is currently engaged in substantial gainful activity (i.e., if

8 the plaintiff is currently working); if the claimant is not engaged in substantial gainful activity,

9 the second step asks if the claimant has a severe impairment or combination of impairments

10 (i.e., an impairment that has a significant effect on the claimant's ability to function); if the

11 claimant has a severe impairment, the third step asks if the claimant has a condition which

12 meets or equals the conditions outlined in the Listings of Impairments in Appendix 1 of the

13 Regulations (the "Listings"); if the claimant does not have such a condition, the fourth step

14 assesses the claimant's residual functional capacity ("RFC") and determines whether the

15 claimant is still capable of performing past relevant work; if the claimant is not capable of

16 performing his past relevant work, the fifth and final step asks whether the claimant can

17 perform any other work based on the claimant's residual functional capacity, age, education,

18 and work experience. *Id.* §§ 404.1520(b)-404.1520(f)(1).

19

**THE ADMINISTRATIVE RECORD**

20   Plaintiff was born in 1956 and earned his high school diploma. (AR 148, 185.) He

21 worked as a welder from 1989 to 2000, in construction from 1999 to 2000, and in a warehouse

22 until 2002. (AR 38-39.) He stopped working in 2002 when he "relocated back out [to

23 California] from North Carolina" because he "had enough of being by [himself]" after he and his

24 wife divorced. (AR 39-40, 181.) Plaintiff has not worked since his relocation. (AR 38.)

25   In May 2009 he filed an application for social security disability benefits. (AR 148.) He

26 alleged he became unable to work on December 2, 2007 because of his disabling impairments.

27 (AR 155.) In particular, he contended that due to a fractured left hip and shattered left elbow he

28 is "all mobility impaired," "unable to walk very far," "cannot lift/carry." (AR 181.) The Social

Security Administration ("SSA") denied his applications on September 28, 2009 (AR 75-79), and again on reconsideration. (AR 91-96.) Plaintiff subsequently requested a hearing before an administrative law judge. (AR 104-05.) On August 4, 2010, Plaintiff, represented by an attorney, appeared before Administrative Law Judge Maxine Benmour ("ALJ"). (AR 34.) The ALJ rendered a decision denying Plaintiff's application for benefits two weeks later. (AR 18-33.) The Appeals Council denied Plaintiff's request for review (AR 1) and this action followed.

**A.      The Medical Evidence**

On February 4, 2006, Plaintiff was brought by ambulance to the Sonoma Valley Hospital emergency room with a "strong manner and odor of alcohol." (AR 313.) The attending physician William Keyser noted that Plaintiff fell while walking and suffered a "nondisplaced fracture of the outer third" of the right shoulder. (*Id.*) While still at the hospital he had another fall suffering a dislocation of his finger. Dr. Keyser ultimately diagnosed Plaintiff with "acute alcoholism" "mechanical fall" and "fractured clavicle" and ordered that Plaintiff, among other things, "refrain from alcohol." (AR 314.)

On December 3, 2007, Plaintiff visited the office of his primary care physician, Dr. Daisy Manuel and reported to the staff that he had "broke[n] his arm" four days earlier. (AR 308.) Since no physician was available, the staff referred Plaintiff to the emergency room. Plaintiff said that he was "fine" and "would go to ER." (*Id.*) Later that day Plaintiff visited the emergency room at Sonoma Valley Hospital. (AR 311.) Dr. Jared Hubbell, the attending physician, noted that Plaintiff explained that he had passed out and injured his left elbow. (*Id.*) Following x-rays, Plaintiff was found to have a comminuted fracture of the elbow (AR 309)as well as a suspected left lung mass. (AR 310.) Plaintiff had surgery on his elbow that same day and was discharged from the hospital the following day. (AR 308.) Approximately two and half weeks later, Plaintiff followed up with Dr. Manuel and complained of pain in his left shoulder. (AR 308.)

Three months later, on March 22, 2008, Plaintiff was admitted to Petaluma Valley Hospital with an intertrochanteric fracture of his left hip. (AR 253.) Dr. Robert Harf performed an open reduction and internal fixation of the left hip. (*Id.*) Dr. Lance Barlas, the discharging physician, noted that postoperatively Plaintiff had alcohol withdrawal and was "tremulous,

1  disoriented, and confused." (*Id.*)  He was minimally mobile by the time of his hospital

2  discharge, "presumably due to his alcohol withdrawal."  On March 28, 2008 he was discharged

3  to a skilled nursing facility for further rehabilitation.  (AR 254.)

4       The notes of Dr. Pushpalatha Arakere who examined Plaintiff on March 23 report that

5  Plaintiff "fell down" and "fractured his left hip" while "bringing wood into the house."  (AR 265.)

6  Dr. Arakere further noted that Plaintiff stated that he was "pretty active," "takes care of himself,"

7  "walks 2-3 miles daily," and "tolerated very well" his "open reduction and internal fixation of a

8  left elbow fracture, done in December of 2007."  (*Id.*)

9       The following month Dr. Chinn of Sonoma Valley hospital reviewed a recent x-ray of

10  Plaintiff's left hip. Dr. Chinn noted that a "[c]ompression screw device transfixe[d] a left femoral

11  neck fracture" and that a "[f]racture component demonstrate[d] impaction."  (AR 470.)

12       In  August 2009, Plaintiff was examined by primary care physician Huaming Chou.  Dr.

13  Chou noted that Plaintiff "generally feels fine" and that he"quit [a]lcohol 16 months [prior]."

14  (AR 368.)  Dr. Chou recorded that he would continue Plaintiff's Vicodin prescription for his

15  history "of [left] hip and [left] elbow fracture."  (AR 369.)

16       On September 15, 2009, Dr. Calvin Pon conducted an orthopedic examination of Plaintiff

17  at the request of the SSA.  (AR 319.)  Dr. Pon noted that Plaintiff complained of left shoulder

18  pain, right shoulder pain, left hip pain, and let elbow pain.  He wrote that Plaintiff had a sitting

19  tolerance of one hour, a standing tolerance of one hour, and that Plaintiff reported that he is able

20  to walk three quarters of a mile and is able to walk up and down stairs. Plaintiff further stated

21  that he "does use a cane 'when [he] need[s] to,'" but did not bring the cane with him to the

22  appointment.  (*Id.*)  Plaintiff reported that he is independent in dressing, cooks and prepares his

23  own meals, feeds himself, does his own shopping, cleans himself, does his own housework,

24  washes dishes, takes out the garbage, vacuums, sweeps and mops the floor, does laundry, and

25  does not drive.  (*Id.*)  Dr. Pon further noted that the "reason claimant is not working presently is

26  not related to any orthopedic issues."  (*Id.*)  Dr. Pon found that Plaintiff "ambulates with no

27  ambulatory aid" and had a stable gait with a slight limp to the left.  (AR 320.)  His report

28  includes a functional capacity assessment wherein he noted that Plaintiff "should be able to

4

United States District Court
Northern District of California

1  stand and/or walk for a total of approximately four hours during an eight-hour work day," "sit

2  for a total of six hours during an eight-hour work day" and that crouching, kneeling, squatting,

3  and climbing stairs should be limited to occasionally.  (AR 321.)  Dr. Pon also opined that

4  Plaintiff "should still be able to perform bilateral pushing and pulling, arm/hand control on a

5  frequent basis" and "should be able to lift and carry 10 pounds frequently and 20 pounds

6  occasionally." (*Id.*)

7       Dr. Manuel completed a Verification of Physical/Mental Incapacity for Plaintiff on

8  October 30, 2009.  (AR 342.)  Dr. Manuel indicated that Plaintiff would be incapacitated from

9  October 30, 2009 to January 30 2010.  (*Id.*)  She also stated that during this time Plaintiff would

10  be "unable to lift, push, pull" and could not perform gardening/maintenance work nor restricted

11  clerical work.  (*Id.*)

12       On November 17, 2009, Dr. William DeMartini of Sonoma Valley Hospital x-rayed

13  Plaintiff's shoulders at the request of Dr. Manuel and found mild degenerative osteoarthritis in

14  the right shoulder and mild degenerative changes in the acromioclavicular joint and

15  psuedoarticulation in the left shoulder.  (AR 344-45.)

16       Dr. Manuel then referred Plaintiff to Dr. Robert Geiger, an orthopedic surgeon.  In

17  December 2009 Dr. Geiger continued Plaintiff's Vicodin prescription and on January 11, 2010,

18  Dr. Geiger gave him an injection.  (AR 462.)  The next day, Dr. Geiger completed a Verification of

19  Physical/Mental Incapacity for Plaintiff to obtain General Assistance. This form noted that

20  Plaintiff had "bilateral shoulder pain" and "evidence of rotator cuff involvement right greater

21  than left."  (AR 352.)  According to the form, Dr. Geiger suggested that Plaintiff would be unable

22  to perform garden or maintenance work nor restricted clerical work from January 12, 2010 to

23  January 12, 2011.  (*Id.*)

24       On March 15, 2010, A. Dipsia, M.D., a consulting physician, completed a Physical Residual

25  Functional Capacity Assessment and found that Plaintiff could occasionally lift/and/or carry 20

26  pounds frequently lift and/or carry 10 pounds, stand for about six hours in an eight-work work,

27  sit for about six hours in an eight-hour work day, and noted that pushing and/or pulling was

28  limited in Plaintiff's lower extremities.  (AR 385.)

5

United States District Court
Northern District of California

1    X-rays of Plaintiff's pelvis and hip in May 2010 revealed an "old" "[l]eft hip fracture . . .

2    with varus deformity and superior migration of the shaft of the femur upon the femoral head"

3    leading to a diagnosis of "minor abnormality." (AR 413-14.)

4    On July 19, 2010, Dr. Manuel completed a Medical Assessment of Ability to Do Work-

5    Related Activities (Physical). (AR 451.) Dr. Manuel noted that Plaintiff could only occasionally

6    lift up to 10 pounds, could only walk for one hour during an eight-hour day, and could only sit

7    for three to four hours in an eight-hour day. (AR 451-52.)

8    On November 18, 2010, Dr. Cornelius O'Neill conducted an orthopedic consult. He found

9    that Plaintiff's left hip pain was "most likely due in a large part to the protruding sliding screw

10   prominence" and opined that this "could certainly be removed and alleviate the problem." (AR

11   476.) Dr. O'Neill further noted that Plaintiff's "imbalanced pelvis" was a significant problem and

12   that he would get a roentgenogram or scanogram to "more exactly determine the degree of

13   correction necessary." (*Id.*) On February 9, 2011, Plaintiff received a steroid injection for his

14   hip. Plaintiff and Dr. O'Neill discussed "the possibility of a total joint on the left as being an

15   alternative method of treatment of his problem." (AR 474.)

16   A few days later Dr. Geiger completed another Verification of Physical/Mental Incapacity

17   form for Plaintiff. (AR 481.) He opined that Plaintiff was unable to perform garden or

18   maintenance work nor restricted clerical work from February 14, 2011 to February 14 2012 as

19   a result of his "bilateral shoulder pain" and "post-traumatic arthritis" of Plaintiff's left hip. (*Id.*)

20   On May 2, 2011, orthopedic attending Dr. Alfred Kuo, cosigning on a note authored by

21   Jun Matsui, noted that Plaintiff has "pain and difficulty walking," "no relief of pain with surgery,"

22   but is able to "walk 1/2 mile with no assistive devices." (AR 488.)

23   **B.    ALJ Hearing Testimony**

24   **1.    Plaintiff's Testimony**

25   Plaintiff's hip is "the biggest deal" and if he didn't have the problem with his hip he would

26   be okay. (AR 44.) He is in pain when walking, turning, and sitting, because he is "lopsided" and

27   wears an orthotic to correct this lopsidedness. (AR 41-43.) He can sit for "two hours at a time"

28   and can walk to the grocery store that is between a half and three-quarters of a mile away, but

6

United States District Court
Northern District of California

1   he needs to take a cab back home.  (AR 41.)  His shoulders bothered him for years, but since he

2   began receiving cortisone injections they are "fine."  (AR 42-43.)  His arm will no longer

3   straighten out all the way, but he only experiences pain when he bumps the elbow or sits it

4   down in the wrong position.  (AR 44.)  He experiences sharp pains when he raises his arms

5   "over shoulder height" and he takes about four hydrocodone a day, though that is below the

6   dosage his doctor recommends.  (AR 45-46.).  While he does not like taking prescription drugs

7   and fears side effects, he has experienced no side effects with the hydrocodone.  (*Id.* at 46.)  He

8   has had back pain that has "come and gone over the years."  (AR 43.)

9       Dr. Manuel is Plaintiff's "primary physician" and he only sees her when he "need[s] to."

10  (AR 47.)  Aside from a consultation that took place "[a]bout a week and a half" prior to his giving

11  his testimony, the last time he saw her was when he broke his elbow in 2007.  (AR 47-48.)

12      Regarding his daily activities, Plaintiff lives by himself and is able do housework, but if he

13  begins to feel pain, he will just "put it off until [he starts] feeling better."  (AR 51.)  He does his

14  own cooking, his own laundry, plays solitaire, builds model ships, and works on puzzles.  (AR

15  51.)  He has a blue and gold Macaw that he sometimes brings to the London House, a retirement

16  community.  (*Id.*)  He sometimes walks about a quarter of a mile to "the Square" and then

17  returns home to "take a nap or whatever."  (AR 52.)  He can sit for an hour and a half to two

18  hours until "it hurts so bad" he has to "get up and move."  (AR 56.)

19      **2.    The Vocational Expert**

20      The ALJ presented a vocational expert with a hypothetical individual of Plaintiff's age,

21  education, and work background with the following limitations: lifting and carrying 20 pounds

22  occasionally and 10 frequently; sitting, standing, and walking six hours in an eight-hour day; no

23  climbing ladders, ropes, or scaffolds; occasionally climbing ramps and/or stairs; occasional

24  balancing, stooping, kneeling, crouching, and crawling; no overhead reaching bilaterally, and a

25  need to avoid exposure to extreme cold and wetness.  (AR 64.)  The ALJ asked if this

26  hypothetical individual could perform any of Plaintiff's prior work and the vocational expert

27  responded that he could not, but that he could perform some jobs, of which 1,200 were available

28  locally and 26,000 nationally.  (AR 65.)  The ALJ inquired whether changing the hypothetical to

7

restrict standing and walking to four hours in a day and adding in "frequent bilateral pushing and pulling of arm and hand controls" would impact the expert's testimony. The expert responded that it would "reduce[] the occupational base of those jobs probably by 50 percent." (*Id.*)

## C.    The ALJ'S OPINION

The ALJ followed the SSA's five-step sequential evaluation process for determining disability. *See* 20 C.F.R. 404.1520(a).

First, the ALJ concluded that Plaintiff had "not engaged in substantial gainful activity since December 2, 2007, the alleged date of onset." (AR 23). Plaintiff's records did not "reveal any earnings since 2002." (Id).

Second, the ALJ concluded that Plaintiff has several severe impairments: "history of left elbow fracture, status post hardware placement; history of left hip inter-trochanteric unstable fracture in March 2008, status post open reduction internal fixation; chronic bilateral shoulder pain; and chronic obstructive pulmonary disease." (AR 23). The ALJ determined that the above impairments "more than minimally affect[ed] the claimant's ability to perform basic work functions." (AR 23). Plaintiff's record revealed a history of drinking, but the ALJ concluded that alcoholism was not a severe impairment because there was no "indication of work-related limitations" related to alcoholism. (AR 24). Additionally, although Plaintiff testified to back pain, the ALJ found that because there was "little evidence of treatment for back pain" and because a "lumbar spine x-ray found minimal degenerative changes," back pain was not a severe impairment. (AR 24).

Third, the ALJ found that Plaintiff did "not have an impairment or combination of impairments that [met] or medically equal[ed] one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 24.)  The ALJ concluded that there was no medical evidence of "an involvement of one major peripheral weight-bearing joint . . ., resulting in ability to ambulate correctly" or "involvement of one major peripheral joint in each upper extremity . . ., resulting in inability to perform fine and gross movements effectively." (AR 24).

Fourth, the ALJ found that Plaintiff:

United States District Court
Northern District of California

> has the residual functional capacity to perform light work as defined in 20 C.F.R. §
> 404.1567(b) and 416.967(b), except that he can lift and/or carry twenty pounds
> occasionally and ten pounds frequently, sit for six hours in an eight-hour
> workday, and stand and/or walk for four hours in an eight-hour workday. The
> claimant cannot climb ladders ropes, or scaffolding, but can occasionally climb
> ramps and stairs. He can occasionally balance, stoop kneel, crouch, and crawl. He
> cannot reach overhead bilaterally and must avoid concentrated exposure to
> extreme cold and wetness."

(AR 24). After concluding that there is an "underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce [Plaintiff's] pain and other symptoms," the ALJ relied on Plaintiff's own testimony and that of several medical experts to conclude that Plaintiff's statements regarding the "intensity, persistence and limiting effects of [his] symptoms" were not credible. (AR 24-26). In making this determination, the ALJ cited evidence of Plaintiff's daily activities and the medical opinions Calvin Pon, M.D., as well as two State agency medical consultants. (AR 25). The ALJ further found that Plaintiff was "unable to perform any past relevant work," as his previous occupations (metal fabricator, materials handler, construction worker) were "performed at the exertionally heavy level, and [were] semi-skilled to highly skilled in nature." (AR 27).

Fifth, the ALJ consulted the Medical Vocational Guidelines and a vocational expert to determine whether, based on Plaintiff's RFC, age, education, and work experience, there was existing work in the national economy that he was capable of performing. (AR 64-66). The vocational expert testified that an individual under Plaintiff's circumstances would be able to perform the "requirements of representative, light unskilled occupations such as cashier . . . and . . . inspector. (AR 28). The ALJ concluded that work of this variety "exists in significant numbers in the national economy" and a "finding of 'not disabled' therefore appropriate." (AR 28.)

## STANDARD OF REVIEW

The Court's jurisdiction is limited to determining whether the Social Security Administration's denial of benefits is supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g). A district court may overturn a decision to deny benefits only if it is not supported by substantial evidence or if the decision is based on legal error. *See*

1    *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallenes v. Bowen*, 881 F.2d 747, 750

2    (9th Cir. 1989).  Substantial evidence is "more than a mere scintilla but less than a

3    preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

4    support a conclusion." *Andrews*, 53 F.3d at 1039.  Determinations of credibility, resolution of

5    conflicts in medical testimony and all other ambiguities are to be resolved by the ALJ.  *See id.*;

6    *Magallenes*, 881 F.2d at 750.  The decision of the ALJ will be upheld if the evidence is

7    "susceptible to more than one rational interpretation."  *Andrews*, 53 F.3d at 1040.

8                                              **DISCUSSION**

9            The ALJ's determination at step five is the primary issue in this case.  The ALJ found that

10   Plaintiff has the residual functional capacity ("RFC") to perform "light work" with certain

11   exceptions.  (AR 24.)  The ALJ further found that there are "jobs that exist in significant

12   numbers in the national economy that the claimant can perform," such as a cashier or an

13   inspector.  (AR 27-28.)  Plaintiff pursues summary judgment on four grounds: (1) the ALJ's

14   credibility finding is not supported by substantial evidence, (2) the ALJ improperly rejected the

15   opinion of Plaintiff's treating physician, (3) the ALJ failed to consider all of the evidence in the

16   record when making the RFC assessment, and (4) the ALJ failed to consider all evidence in the

17   record when making a determination as to Listing 1.02.  The Court considers each of these

18   arguments in turn.

19   **A.      The ALJ's Credibility Determination**

20           In concluding that Plaintiff has the RFC to perform light work, the ALJ found that

21   Plaintiff's testimony  regarding the "intensity, persistence and limiting effects of" his symptoms

22   "are not credible" to the extent they contradict the RFC determined by the consulting physicians.

23   (AR 26.)  In particular, the ALJ found:

24           The claimant's testimony was not entirely credible.  Although he testified to
25           severe hip pain, he is able to walk one-half to three quarters of a mile to the
             grocery store.  He testified that he lives alone, can do housework with no
26           problems, builds model ships, reads, puts together thousand piece puzzles, plays
             twenty hands a day of solitare, does his own cooking, does his own laundry, does
27           his own grocery shopping, and has no problems taking care of his personal needs.

28

United States District Court
Northern District of California

These are all activities that indicate that the claimant is not as disabled as he alleges.

(AR 26.)

An ALJ's findings concerning credibility must be "grounded in evidence" and articulated with "sufficient[] specific[ity] [so as] to make clear to the individual and to any subsequent reviews the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 (July 2, 1996). After determining that there is a "medically determinable impairment that could reasonably be expected to cause the claimant's symptoms, an ALJ may only reject a claimant's testimony regarding the severity of his or her symptoms "if he makes specific findings stating clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 n.1, 1284 (9th Cir. 1996).  However, the ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  Further, when evaluating credibility, an ALJ may consider "the claimant's daily activities."  20 C.F.R. §§ 404.1529(c)(3)(i),416.929(c)(3)(i); *Smolen*, 80 F.3d at 1284; *see also Fair*, 885 F.2d at 603 (stating that the claimant's daily activities may be evidence upon which an "ALJ can rely to find a pain allegation incredible.").

Plaintiff insists that the ALJ's credibility findings are not grounded in evidence because the ALJ failed to address "important parts of [Plaintiff]'s testimony" without providing "clear and convincing reasons" for "rejecting" this testimony.  (Dkt. No. 20 at 8.)  Plaintiff argues that the ALJ did not consider Plaintiff's "complete testimony" (Dkt. 20 at 6), and in fact "misstated" testimony and included "false statements."  (Dkt. No. 25 at 3.)

Plaintiff first challenges the ALJ's finding that Plaintiff "can do housework with no problems" and that Plaintiff "has no problems taking care of his personal needs." (AR 26.) Plaintiff contends that these conclusions reflect the ALJ's refusal to consider Plaintiff's testimony in its entirety.  In a colloquy with the ALJ, Plaintiff testified as follows:

Q:     So, you are able to do your housework with no problems?

A:     No.  I mean, if pain starts to get to me, I just put if off until I start feeling better and then I will go back and finish it up.  It's—I will do as far as I can

|    |    |                                                                                              |
|----|----|----------------------------------------------------------------------------------------------|
| 1  |    | go.  I mean, if it gets to where it's, you know, bothering me too, much, I will               |
| 2  |    | just relax for a while or work on a puzzle or play solitare or work on my                    |
| 3  |    | model ship, or whatever.                                                                      |
| 4  | Q: | Okay. And, do you do your own cooking?                                                         |
| 5  | A: | Yes, ma'am.                                                                                    |
| 6  | Q: | And, do you do your own laundry?                                                               |
| 7  | A: | Yes, ma'am.                                                                                    |
| 8  | Q: | And, you said you go to the grocery stores, but then you have to take a cab                   |
| 9  |    | home.                                                                                          |
| 10 | A: | Home. Because I usually don't go, but maybe twice a month and I just stock                    |
| 11 |    | up at one shot. And, I just load it all up in a cab and get home and put it all               |
| 12 |    | up. Then it's time for a nap.                                                                  |
| 13 | Q: | You have to take a nap after you go to the grocery store?                                      |
| 14 | A: | Yes.  I mean, after I do anything that's, you know, strenuous.  I go over to                   |
| 15 |    | London House, which is a retirement community, because I have a blue and                     |
| 16 |    | gold Macaw as a pet. And, I take him over there to visit the people over                       |
| 17 |    | there and they get a kick out of that.                                                         |
| 18 | Q: | Okay.                                                                                          |
| 19 | A: | Or else I go up to the Square, which is about a quarter of a mile away from                   |
| 20 |    | me, but I just walk up and back is enough to turn around and make me just                     |
| 21 |    | – You know, I have got to turn around and relax and take a nap or                             |
| 22 |    | whatever.                                                                                      |
| 23 | Q: | So, how often do you take naps, would you say?                                                 |
| 24 | A: | Maybe twice a day.                                                                             |
| 25 | Q: | So, every day you are taking a nap?                                                            |
| 26 | A: | I have to, because it's – I mean, I have a pain issue that doesn't go away. I                 |
| 27 |    | mean, it's constantly there.                                                                   |
| 28 | Q: | So, when you take a nap, how long does that usually last?                                      |

United States District Court
Northern District of California

12

1    A:    Only about 15-minutes.

2 (AR 38, 51-52.)  The ALJ's language, when read in the context of all of her findings and Plaintiff's

3 testimony, suggests that Plaintiff does not necessitate assistance in attending to his personal

4 needs and daily activities.  That he requires two 15-minute naps a day, even if believed, does not

5 make the ALJ's statement that he has "no problems taking care of his personal needs" erroneous.

6 Although Plaintiff's testimony also could afford an inference more favorable to Plaintiff, the

7 ALJ's interpretation was rational and thus must be upheld.  *See Burch v. Barnhart,* 400 F.3d 676,

8 680 (9th Cir. 2005); *see also Molina v. Astrue,* 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when

9 the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's

10 findings if they are supported by inferences reasonably drawn from the record"); *Morgan v.*

11 *Commissioner of Soc. Sec. Admin.*, 169 F.3d 595, (9th Cir. 1999) ("resolutions of conflicts in the

12 testimony are functions solely of the Secretary").

13    Plaintiff's complaint that the ALJ ignored Plaintiff's testimony regarding his need to take

14 a taxi home from the grocery store and Plaintiff's difficulty in sitting for extended periods of

15 time is similarly unavailing. In support of her finding that Plaintiff's testimony pertaining to

16 severe hip pain was not credible, the ALJ again relied on evidence of Plaintiff's daily activities.

17 The ALJ noted that Plaintiff "is able to walk one-half to three-quarters of a mile to the grocery

18 store," lives alone and performs his own housework.  (AR 26.)  While some of these activities are

19 performed with difficulty or require rest, they are still "grounds for discrediting the claimant's

20 testimony to the extent that they contradict claims of a totally debilitating impairment."  *Molina*,

21 674 F.3d at 1113; *see also Fair*, 885 F.2d at 603 (holding that "if despite . . . claims of pain, a

22 claimant is able to perform household chores and other activities that involve many of the same

23 physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that

24 the claimant's pain does not prevent the claimant from working").

**B.    Weight Afforded to Dr. Manuel's Opinion**

26    Plaintiff next argues that the ALJ did not give sufficient weight to the opinion of Dr. Daisy

27 Manuel, Plaintiff's treating physician. "Cases in [the Ninth Circuit] distinguish among the

28 opinions of three types of physicians: (1) those who treat the claimant (treating physicians);

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1  (2) those who examine but do not treat the claimant (examining physicians); and (3) those that

2  neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d

3  821, 830 (9th Cir. 1996).  In evaluating medical opinions, more weight is generally afforded "to

4  the opinion of a treating source than to the opinion of doctors who do not treat the claimant."

5  *Id.* "The ALJ must either accept the opinions of [a claimant's] treating physicians or give specific

6  and legitimate reasons for rejecting them." *Embrey v. Bowen*, 849 F.2d 418, 422 n.3 (9th Cir.

7  1988).

8       The ALJ gave specific and legitimate reasons for rejecting Dr. Manuel's opinion. First, the

9  ALJ observed that Dr. Manuel had last seen Plaintiff in 2007; he only saw her in 2010 to have

10 her complete the RFC form. (AR 26.) The ALJ concluded: "There is no indication in the record

11 that Dr. Manuel has examined or treated claimant so that she was familiar with his limitations

12 at the time she completed the form." (*Id.*)

13      Second, the ALJ reasoned that Dr. Manuel's opinion is "inconsistent with examining

14 sources." (*Id.*)  The ALJ noted that Dr. Pon, an independent examining physician, concluded

15 that Plaintiff could "stand and/or walk for a total of approximately four hours" and "sit for a

16 total of six hours during an eight hour work day." (AR 321.)  Dr. Pon further concluded that

17 Plaintiff "should be able to lift and carry 10 pounds frequently and 20 pounds occasionally" and

18 perhaps more significantly, that the "reason claimant is not working presently is not related to

19 any orthopedic issues." (AR 319.)  In addition to the opinion of Dr. Pon, the ALJ relied on the

20 opinions of two "State agency medical consultant[s]." (AR 25.)  Non-examining "State agency

21 medical consultant [S. Valadez] determined in September 2009 that the claimant could engage

22 in a reduced range of light activity." (AR 25.)  The ALJ also noted that in March 2010 State

23 agency medical consultant and examining physician Dr. Dipsia concluded that Plaintiff could

24 "lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk for a

25 total of about six hours in an eight-hour work day, and sit for a total of about six hours in an

26 eight-hour workday, with limitations for pushing and pulling in the lower extremities." (*Id.*)

27      Third, the ALJ stated that Dr. Manuel's RFC was inconsistent "with the record as a whole."

28 In particular, the ALJ concluded that in addition to the medical opinions of doctors, Plaintiff's

United States District Court
Northern District of California

1    own testimony belied the medical conclusion reached by Dr. Manuel.  As mentioned above,

2    Plaintiff "lives alone," does his own housework, and is able to walk to the grocery store and to

3    "the London House."  (AR 26, 51.)  Accordingly, it was not error for the ALJ to determine that

4    the medical opinions of Dr. Pon and the State agency medical consultants are "more consistent

5     . . . with the record as a whole" and are thus entitled to "more weight."  *Batson v. Commissioner*

6    *of Social Security Administration*, 359 F.3d 1190, 1195 (9th Cir. 2004).

7        Plaintiff's challenge to the ALJ's finding that Dr. Manuel had not examined Plaintiff since

8    2007 is unpersuasive.  The ALJ did not find that Plaintiff did not have any contact with Dr.

9    Manuel; rather, she found that that there was no evidence that she treated him around the time

10   she completed the form identifying his limitations.  Plaintiff himself testified that he had not

11   seen her since 2007.  (AR 47-48.) Since the elbow injury occurred in December 2007, Plaintiff's

12   testimony could be interpreted to mean that the last time he saw Dr. Manuel was sometime

13   after the accident, at some point in 2008, since during that last visit Dr. Manuel "started

14   unwrapping it."  (AR 48.)  But such interpretation does not cast doubt on the ALJ's finding that

15   Dr. Manuel did not treat Plaintiff around the time she opined as to his limitations. Further, this

16   last visit was for his elbow, not his hip.

17       The medical records cited by Plaintiff do not necessarily contradict Plaintiff's testimony

18   and the ALJ's finding about when Plaintiff last saw Dr. Manuel. Dr. Manuel's completion of a

19   Verification of Physical/Mental Incapacity form in 2009 does not mean she examined or even

20   saw Plaintiff before doing so. Further, many of the medical record entries to which Plaintiff

21   cites refer to phone contact. (AR 457-58.) Others appear to reflect notations as to Plaintiff's

22   visits with other doctors. (AR 457.) Those that identify Dr. Manuel as the "referring" or

23   "ordering" doctor do not necessarily mean Dr. Manuel physically examined Plaintiff on those

24   days.

25   **C.     The ALJ's Consideration of Evidence When Assessing Plaintiff's RFC**

26       Plaintiff next contends that when the ALJ assessed Plaintiff's RFC, she failed to consider

27   all relevant evidence in the record, as is required by SSR 96-8p, 1996 WL 374184 (July 2, 1996).

28

1    In particular, Plaintiff argues that his Exertion Questionnaires--which he classifies as lay witness

2    testimony--corroborate his hearing testimony and thus should have been considered by the ALJ.

3    "[F]riends and family members in a position to observe a claimant's symptoms and daily

4    activities are competent to testify as to her condition." *Dodrill v. Shalala*, 12 F.3d 915, 918-19

5    (9th Cir. 1993).  Plaintiff's own testimony, however, cannot operate as lay witness testimony, as

6    he would merely be corroborating his own testimony.  In any event, "an ALJ's failure to

7    comment upon lay witness testimony is harmless where the same evidence that the ALJ referred

8    to in discrediting the claimant's claims also discredits the lay witness's claim." *Molina*, 674 F.3d

9    at 1121-22 (citations omitted).  This statement of law indicates not only that lay witness

10   testimony is distinct from claimant's testimony, but also that, in this case, the reasons for

11   discrediting Plaintiff's testimony are sufficient to also discredit his "corroborat[ing]" Exertion

12   Questionnaires.  (Dkt. No. 20 at 10.)

13          Plaintiff also argues that the ALJ "ignored . . . and failed to mention" Plaintiff's testimony

14   regarding "put[ting] a hip in" and the severity of his hip pain.  (Dkt. No. 25 at 5.) The ALJ,

15   however, does not need to address every piece of evidence when interpreting the record.

16   *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003).  Plaintiff argues further

17   that his hip pain is corroborated by the medical opinions of Dr. O'Neill, Dr. Kuo, and Dr. Geiger.

18   The Court agrees that the records from these physicians could support a finding in Plaintiff's

19   favor; however, that the evidence is "susceptible to more than one rational interpretation,"

20   does not provide a sufficient basis for the Court to reverse or remand. *Andrews*, 53 F.3d at 1040.

21   The opinions cited by Plaintiff are arguably consistent with the ALJ's RFC assessment.  At the

22   second step of analysis, the ALJ found that Plaintiff's impairment was severe. The cited medical

23   findings support this conclusion, but do not contradict the ALJ's RFC determination to such an

24   extent that her finding of not disabled is not supported by substantial evidence.

25   **D.     The ALJ's Consideration of Relevant Evidence When Assessing Listing 1.02**

26          The ALJ concluded that Plaintiff did not have "an impairment or combination of

27   impairments that [met] or medically equal[ed] one of the listed impairments in 20 C.F.R. Part

28   404, Subpart P, Appendix 1."  (AR 24.)  Plaintiff argues that the ALJ did not consider all relevant

16

evidence when finding that Plaintiff did not meet or equal Listing 1.02.  Plaintiff baldly asserts that "ample evidence shows that Plaintiff meets Listing 1.02" and that the "ALJ failed to consider [P]laintiff's combination of impairments: left hip pain, bilateral shoulder pain, and COPD, during the entire period from the alleged date of onset."  (Dkt. No. 20 at 12.)  Plaintiff makes no reference as to what "ample evidence" supports such a conclusion and consequently, the Court need not address this argument.  *Carmickle v. Comm'r of  Soc. Sec.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008).

**CONCLUSION**

For the reasons explained above, Plaintiff's motion for summary judgment is DENIED and Defendant's motion for summary judgment is GRANTED. Judgment will be entered in Defendant's favor and against Plaintiff.

This Order disposes of Docket Nos. 20 and 24.

**IT IS SO ORDERED.**

Dated: September 30, 2013

_Jacqueline S. Corley_
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE

United States District Court
Northern District of California

17